# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**MILES DEPEW,**

          Plaintiff,

vs.                                   **No. CIV 00-464 BB/LCS**

**KENNETH S. APFEL**, **Commissioner,**
**Social Security Administration,**

          Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court upon Claimant's Motion to Reverse or Remand Administrative Decision (*Doc. 9*), filed August 2, 2000.  The Commissioner of Social Security issued a final decision denying the Claimant his claim for a period of disability pursuant to Title II of the Social Security Act, 42 U,S,C, §§416(i) and 423. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is well-taken and recommends that it be GRANTED.

## PROPOSED FINDINGS

## I. PROCEDURAL RECORD

1.       Miles Depew filed an application for disability insurance benefits with the Social Security Administration on May 8, 1996 alleging a disability since February 21, 1994. *See* R. at 44. Mr. Depew alleges that he suffers from multiple impairments including problems involving his right hip, knee and shoulder, lumber spine, remnants of a head injury as well as a history of

1

cardiovascular problems with angioplasty and liver dysfunction. (Pl.'s Brief at 2). Claimant's application was denied at the initial level on August 27, 1996, *See* R. at 40, and at the reconsideration level on March 7, 1997. *See* R. at 40. Claimant appealed the denial of his claim by filing a Request for Hearing by Administrative Law Judge on March 27, 1997.  *See* R. at 40.

  2. The Commissioner's Administrative Law Judge (ALJ) conducted a hearing on Depew's application on June 11, 1997. *See* R. at 18. The ALJ analyzed Claimant's petition according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993).  The ALJ found that Depew had not engaged in substantial gainful activity since the onset of his condition (Step 1); that he did not suffer from a severe impairment or combination of impairments (Step 2); and that the severity of Depew's impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599 (Step 3).  *See* R. at 19.  Neither party disputes these findings. The ALJ also found there was evidence which established that the Claimant still consumed alcohol, which acted as a contributing factor to the determination of disability and that the Claimant was not considered disable as defined under the Social Security Act, 20 CFR 404.1520(f). *See* R. at 23.

  3. The ALJ then found that Depew's residual functional capacity enabled him to do most sedentary work, cable splicing or electrical estimating or supervising, and determined that he could perform actual functional demands and job duties of a particular past relevant job. (Step 4). *See* R. at 22. The ALJ based his finding on the following facts: the Claimant's alcohol dependance as a contributing factor to his disability; the fact that aspirin and alcohol relieved his pain; and that his daily activities included cooking, cleaning, and playing golf. *See* R. at 22.

4.      The ALJ entered his decision on March 25, 1998. *See* R. at 15. On April 28, 1999,

the Claimant filed a request for review to the Appeals Council. *See* R. at 10. Thereafter, the

Appeals Council issued its decision denying request for review and upholding the final decision of

the ALJ. *See* R. at 5. The Claimant subsequently filed his complaint for court review of the ALJ's

decision on March 31, 2000. (*Doc. 1*).

## II. STANDARD OF REVIEW

5.      The standard of review in this Social Security appeal is whether the

Commissioner's final decision is supported by substantial evidence and whether he applied correct

legal standards.  *See Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-

98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to

support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F.2d 1045, 1047

(10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983) (citation

omitted)).  A decision of an ALJ is not supported by substantial evidence if the evidence

supporting the decision is overwhelmed by other evidence on the record.  *See Gossett v. Bowen*,

862 F.2d 802, 805 (10th Cir. 1988).

6.      In order to qualify for disability insurance benefits, a Claimant must establish a

severe physical or mental impairment expected to result in death or last for a continuous period of

twelve months which prevents the Claimant from engaging in substantial gainful activity. *See* 42

U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d at 1486. The regulations of the Social

Security Administration require the Commissioner to evaluate five factors in a specific sequence

in analyzing disability applications. *See* 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation

process ends if, at any step, the Commissioner finds the Claimant is not disabled.  *See Thompson*

*v. Sullivan*, 987 F.2d at 1487.

7.     At the first four levels of the sequential evaluation process, the Claimant must

show he is not engaged in substantial gainful employment, he has an impairment or combination

of impairments severe enough to limit his ability to do basic work activities, and his impairment

meets or equals one of the presumptively disabling impairments listed in the regulations under 20

C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20

C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the Claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience.  *See id.*

## III. ADMINISTRATIVE RECORD

8.     The record indicates that Depew's alleged onset date of disability is February 21,

1994. *See* R. at 44. Since that time, the Claimant attributes back problems, subsequent surgical

interventions, and right knee problems to his inability to work. *See* R. at 41. In 1988, Depew

underwent an angioplasty and has had no symptoms relating to that surgery since then. *See* Rec.

at 173. In April of 1991, Depew sustained a severe closed head injury and underwent surgery to

repair a depressed skull fracture. *See* Rec. at 219.  As a result, he was in a coma for

approximately one month. *See* Rec. at 219. He returned to work on a regular basis with only a

minimal decrease in earnings. *See* Rec. at 47-50. The Claimant made attempts to work in 1994 but

discontinued all employment when he injured his hip in February of 1994. *See* Rec. at 201. Dr.

Rivero indicated that the "Patient may not perform his regular occupation" for a period of six to

twelve months because he needed physical therapy for his lumbar spine. *See* Rec. at 197.

9.     In early 1995, Depew was scene by Dr. W. Rosette for multiple comprehensive

examinations. Dr. Rosette stated, within his evaluations, that Depew appeared to be healthy, however, presented symptoms of abnormal liver function. *See* R. at 156 and 164. He also stated that Depew drank not more than seven drinks a day when he was home and that he was not particularly interested in changing his lifestyle. *See* R. at 156 and 164.

10.     Radiographic reports and MRIs taken in July of 1996 indicated that Depew's spine maintained severe changes and that he had lumber scoliosis. *See* R. at 194.  Dr. Dennis Rivero diagnosed Depew with moderate to severe hip and back pain and suggested that the he not perform his regular occupation in order to receive physical therapy for lumber spine strengthening. *See* R. at 197. In August of 1996, Dr. Crawford examined Depew, a spinal surgeon, and concluded that "his symptoms are debilitating and severely effecting his activities of daily living," and that surgery was his best option. *See* R. at 190. The next month, Depew obtained advice for possible surgery from Dr. Jameson. Dr. Jameson concluded that Depew was suffering from a two to three year history of back pain and that it was worsening. *See* R. at 173. He also stated that Depew denied any complaints of chest pain and that he generally appeared to be a healthy male. *See* R. at 174. Dr. Jameson concluded that Depew's macrocytosis [1] was likely due to his drinking and that he consumed six to ten drinks a day, but that there was no special risk to having surgery.  *See* R. at 173 and 176.

11.     Subsequently, Depew was referred to and examined by Dr. Frank Mowry in October of 1996. In his evaluation, Dr. Mowry stated that Depew presented symptoms of "pressure" associated with shortness of breath that were similar to his 1988 episode of myocardial

---

[1]     Macrocytosis is a medical condition pertaining to the occurrence of unusually large number of mature red blood cells circulating in the blood. STEDMAN'S MEDICAL DICTIONARY 1050 (26th ed. 1995).

infarction.  *See* R. at 179. Dr. Mowry's overall assessment was that Depew should receive an

echo examination as well as a cardiolysis,[2] however, the patient refused due to the cost.  *See* R. at

179.

12.     On October 29, 1996, Depew underwent bilateral laminectomies of the spine.

On November 21, 1996, during a checkup from the surgery, it was noted that Depew was doing

very well and had minimal amounts of complaints.  *See* R. at 186. However, it is well noted

throughout the record that Depew complained of low back pain throughout 1997. *See* R. at 237,

247, 249, 250, 251, and 253.

13.     In September of 1997, Depew received a psychological evaluation from Dr. Gary

Harmon. In that evaluation, Depew complained of being "physically unable to work" due to pain

in his lower back, right hip, and leg. *See* R. at 237. Depew also complained that he had problems

with his short term memory. *See* R. at 237. Activities of daily living included taking care of his

clothing and personal hygiene, using notebooks as reminders, cooking simple meals, shopping,

driving, and going to bars for drinks, especially in the morning. *See* R. at 239. Dr. Harmon

summarized his diagnosis by stating that Depew had an intellectual level that was in the high

average range, that there was some evidence of deterioration in Depew's performance abilities

and that these symptoms could have been caused by "head trauma or years of abusing alcohol."

*See* R. at 240. Dr. Harmon also stated that there was no evidence of a memory deficit or mood

disorder but that Depew possessed "problems with the social environment, occupational

problems." *See* R. at 240.

---

[2]     A cardiolysis is an operation for loosening up cartilage by way of resection of the sternum.
STEDMAN'S MEDICAL DICTIONARY 281 (26th ed. 1995).

6

14.     After the administrative hearing, Depew was evaluated by Dr. Saverio

Sava in February of 1999. (Pl.'s Brief Ex. A). Dr. Sava filled out a physician's questionnaire and

stated that Depew suffered from low back pain and that he should limit his standing and sitting to

two hours at a time. (Pl.'s Brief, Ex. A).

## III. DISCUSSION

15.     Claimant raises the following arguments in support of his Motion to Reverse or

Remand the Administrative Agency Decision.  First, Claimant contends that the ALJ erred in his

assessment of Depew's credibility. Second, the ALJ failed to properly state the basis for Depew's

residual functional capacity finding and that he could perform the full range of sedentary work.

(Pl.'s Brief at 6).

### The ALJ's Credibility Finding

16.     Claimant asserts that the ALJ erred in assessing his credibility. "Credibility

determinations are peculiarly the province of the finder of fact, and will not be overturned if

supported by substantial evidence." *See Diaz v. Secretary of Health & Human Servs.*, 898 F. 2d

774, 777 (10th Cir. 1990). Therefore, the ALJ is required to consider complaints of pain by

evaluating use of pain medication, attempts to obtain relief, the frequency of medical contacts, and

the nature of daily activities, as well as subjective measures of credibility including the consistency

or compatibility of non-medical testimony with the objective medical evidence. *See Kepler v.*

*Chater*, 68 F. 3d 387, 391 (10th Cir.1995).

17.     The ALJ's finding with respect to the Claimant's credibility is somewhat

unclear. The transcript reveals questions made by the ALJ pertaining to the Claimant's attempts to

find relief for his pain, willingness to try any treatment prescribed, his contact with physicians,

possible psychological disorders, his daily activities, and the effectiveness of medication. *See* R. at

296, 297, 301, 302 and 306. With respect to the attempts to find relief, willingness to try

treatment and the effect of such treatment, the ALJ questioned Depew about the pain medication

that had been prescribed for his heart, back and leg problems. *See* R. at 296, 305 and 306. Depew

answered, on all occasions, that the medicines did not work and that aspirin coupled with alcohol

was his only remedy. *See* R. at 296, 305, and 306. He stated that the prescribed medication "upset

his stomach" and that the aspirin coupled with alcohol "keeps his muscles relaxed where they

don't tighten up." *See* R. at 305 -06. The ALJ also asked Depew about his daily activities. Depew

answered that he does his own laundry, cooking, and shopping but no longer participates in any

hobbies. *See* R. at 301-02.

18.     In reviewing the ALJ's findings, it is not the responsibility of this Court to reweigh

the evidence or substitute its decision for that of the ALJ; however, "[f]indings as to credibility

should be closely and affirmatively linked to substantial evidence and not just a conclusion in the

guise of findings." *Huston v. Bowen*, 838 F.2d 1125,1133 (10th Cir. 1988). The Court must

review the record as a whole, and "the substantiality of the evidence must take into account

whatever in the record fairly detracts from its weight." *Talbot v. Heckler*, 814 F.2d 1456, 1461

(10th Cir. 1987).

19.     Although the Court ordinarily defers to the ALJ as trier of fact on credibility,

*Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993), deference is not an absolute rule.

*See Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987). Where the ALJ does not fully believe

subjective testimony, he is required to make specific findings and state his reasons for disbelieving

evidence or testimony supporting his belief. *See Claassen v. Heckler*, 600 S.Supp. 1507 (D.Kan.

8

1985). Failure to make credibility findings regarding critical testimony "fatally undermines the [Commissioner's] argument that there is substantial evidence adequate to support his conclusion that Claimant is not under a disability." *Id.*

20.     The ALJ in this case failed to make such specific findings. He does not refer to any evidence in the record regarding inconsistencies or indications that Depew's pain and symptoms are false. He merely concluded that Depew's allegations were not supported by evidence in the record; that Depew's impairment can be relieved with over the counter medication; and that Depew is capable of performing a wide range of daily living activities. *See* R. at 22.

21.     First, the Court fails to find any evidence in the record which indicates that Depew's complaints of back and hip pain can be remedied with over the counter medication.[3] Second, although Depew testified to performing daily activities, the ALJ ignored evidence in the record where Depew stated he stopped playing golf and that he performed his daily chores very slowly. *See* R. at 54.  Lastly, the mere statement that the Claimant does not take prescribed medication is insufficient to conclude incredibility.[4] The ALJ's findings are thus conclusory in nature and are not sufficiently supported by evidence. *See Kepler*, 68 F.3d at 391.

22.     Additionally, Depew has produced evidence within his memorandum brief,

---

[3]     The ALJ must investigate all avenues presented that relate to subjective complaints, including nature, location, onset, duration, frequency, radiation and intensity of pain; aggravating factors, adverse side effects of medications, treatment, other than medication, for relief of pain, functional restrictions; and Claimant's daily activities. SOC. SEC. REG. §88-13; *See also Luna*, 834 F.2d at 166.

[4]     Before the ALJ may rely on the Claimant's failure to pursue treatment or take medication as support for his determination of noncredibility, he or she should consider "(1) whether the treatment at issue would restore Claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse." *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993).

not admitted in the record at his March 1998 hearing, pertaining to relevant physical evaluations that could effect the ALJ's decision on credibility.[5] A remand is proper when a reviewing court concludes that "the Secretary's decision might reasonably have been different had that (new) evidence been before him when his decision was rendered."[6] *See Cagle v. Califano*, 638 F.2d 219, 221 (10th Cir. 1981) (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). Evidence is "new" within the meaning of 20 C.F.R. § 404.970(b) if it is not duplicative or cumulative. *See Lawson v. Chater*, 83 F.3d 432, *2 (10th Cir. 1996).  Evidence is "material" to the determination of disability "if there is a reasonable possibility that "[it] would have changed the outcome." *Id.* The evidence is not duplicative or cumulative to the record since it is a summary of the Claimant's current ability to do work. Also, such evidence could possibly influence the decision maker as to whether the Claimant's symptoms are actual or imagined.

23.    While the ALJ considered some of the *Kepler* factors in his opinion,  he could not have assessed the consistency of the non-medical testimony with the objective medical evidence because he did not have all the medical evidence before him. Therefore, this case should be remanded to allow the ALJ to re-evaluate the Claimant's credibility in light of the complete record.

---

[5]     This evaluation was submitted to the Appeals Council for its review. The evaluation, filled out on February 11, 1999, reveals that Mr. Depew has functional tolerances for sitting and standing limited to two hours at a time. (Pl.'s Brief Ex. A). Regulations require the Appeals Council to consider evidence submitted with a request for review if the additional evidence is (a) new, (b) material, and (c) related to the period on or before the date of the ALJ's decision.  See O'Dell v. Shalala, 44 F.3d, 855, 858 (10th Cir. 1994); 20 C.F.R. § 404.970(b).

[6]     This Court is not remanding this case based on the fact that there is additional evidence. However, because I have concluded that the ALJ erred by not supporting his credibility assessment with sufficient evidence from the record, the ALJ will have the opportunity to review this newly admitted evidence. This Court concedes that it normally does not consider evidence presented for the first time on appeal. *See Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996) (citing *Selman v. Califano*, 619 F.2d 881, 884-85 (10th Cir.1980)).

**The ALJ's Finding that Mr. Depew could Perform Past Relevant Work**

24.     The Claimant argues that the ALJ's finding, that he could perform past relevant work, was not supported by the evidence and was based on multiple errors. (Pl.'s Brief at 8-9). The ALJ initially found that the "Claimant's alcohol dependance is a contributing factor material to the determination of disability, and that the Claimant's remaining alleged physical impairments are not disabling." *See* R. at 21. The ALJ subsequently found that "[b]ecause the Claimant's medically determined impairments [were] controlled through proper use of medication, he [was] able to perform the demands of light work activity." *See* R. at 22. It seems that the ALJ also relied on the fact that Depew could perform certain daily activities and that the vocational expert testimony which stated that the Claimant was capable of performing past relevant work.

25.     After reading the ALJ's findings, it is not clear  whether the ALJ's reference to Depew's alcohol use was in connection to his assessment of Depew's credibility or to his ability to perform past relevant work. The ALJ's holding is also unclear as to whether he analyzed Depew's alcohol use as required pursuant to recent statutory amendments. 42 U.S.C. §423(d)(2)(C). However, in either case, the ALJ's must first determine whether the Claimant is disabled, and if so, if his alcohol use is a material factor contributing to his disability. *See Sherman v. Apfel*, 141 F.3d 1185, *3 (10th Cir. 1998).

26.     Section §423(d)(2)(C) states that Social Security benefits will be denied where drug addiction or alcoholism is a contributing factor material to a finding of disability.  Drug and alcohol addiction is "material" if the Claimant would not be found disabled but for the drug and alcohol addiction.  20 C.F.R. §§404.1535, 416.935. The Tenth Circuit has interpreted this statute in an unpublished opinion, *Sherman v. Apfel*, 141 F.3d 1185, *3 (10th Cir. 1998). The Court

states that

> [t]he implementing regulations make clear that a finding of disability by the Commissioner is a condition precedent to an application of the amendatory language: 'If [the Commissioner] find[s] you are disabled and ha[s] medical evidence of your drug addiction or alcoholism, [the Commissioner] must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.' 20 C.F.R. §§ 404.1535(a), 416.935(a). To make this determination, the Commissioner must decide whether the Claimant would still be found disabled if the Claimant stopped using drugs. *See id.* §§ 404.1535(b)(1), 416.935(b)(1). If so, then the drug addiction is not a contributing factor material to the finding of disability. *See id.* §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). If, however, the Claimant's remaining impairments would not be disabling without the drug addiction, then the drug addiction is a contributing factor material to the finding of disability. *See id.* §§ 404.1535(b)(2)(I), 416.935(b)(2)(I). *See Sherman*, 141 F.3d at *3.

27.     The Claimant contends that he was seeking disability benefits based on his allegation of a disabling back pain. *See* R. at 26.  Although there were evaluations in the record pertaining to Depew's use of alcohol and how it may have affected his health, these evaluations may not be material since they do not connect the use of alcohol to Depew's back problems.[7] These circumstances may lead the ALJ to find that the Claimant's drug and alcohol addiction is not "material" to this case. Thus, any conclusion that alcohol is a contributing material factor to the determination of Depew's disability requires an analysis established under 42 U.S.C. §423(d)(2)(C) and *Sherman*. Therefore, the ALJ's conclusory statement that the "Claimant's alcohol dependance is a contributing factor material to the determination of disability," must be predicated first with the finding of a disability, and if so, then must be evaluated pursuant to §423(d)(2)(C).

---

[7]     There is nothing in the record stating that Depew's back problems are due to his use of alcohol. It is the discretion of the ALJ upon remand to weigh such evidence.

## RECOMMENDED  DISPOSITION

I recommend that Claimant's motion be granted and this case be remanded to the Social Security Administration for further findings consistent with this analysis.  Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C).  Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court written objections to such proposed findings and recommendations.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**

141 F.3d 1185 (Table)
98 CJ C.A.R. 1640
Unpublished Disposition
**(Cite as: 141 F.3d 1185,  1998 WL 163355 (10th Cir.(Okla.)))**


NOTICE:  THIS IS AN UNPUBLISHED OPINION.


(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA10 Rule 36.3 for rules regarding the citation of unpublished opinions.)


United States Court of Appeals, Tenth Circuit.

Frances SHERMAN, Plaintiff-Appellant,
v.
Kenneth S. APFEL, Commissioner, Social Security Administration, [FN*]
Defendant-Appellee.

**No. 97-7085.**

April 8, 1998.


Before ANDERSON, McKAY, and LUCERO, Circuit Judges.


ORDER AND JUDGMENT [FN**]

**\*\*1** Plaintiff appeals from a district court order affirming the Commissioner's decision to deny her applications for disability insurance benefits and supplemental security income. [FN1]   In what became the final decision of the Commissioner, the administrative law judge (ALJ) found that plaintiff's chronic hepatitis C, depression, and substance addiction constituted severe impairments.   The ALJ further found, however, that plaintiff's impairments only restricted her to light work involving simple tasks.   Therefore, the ALJ concluded that plaintiff retained the residual functional capacity (RFC) to perform four of her past jobs, which involved light or sedentary, unskilled work.

 We review the Commissioner's decision to determine whether it "is supported by substantial evidence and adheres to applicable legal standards." Berna v. Chater, 101 F.3d 631, 632 (10th Cir.1996).  "Because [s]ubstantiality of evidence must be based upon the record taken as a whole, we must meticulously examine the record to determine whether the evidence in support of the [Commissioner's] decision is substantial and take into account whatever in the record fairly detracts from its weight."  Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir.1994) (quotations and citations omitted).   We reverse and remand for further proceedings in light of cumulative errors undermining the ALJ's analysis of plaintiff's impairments.

I. The Evidence

 In June 1991, plaintiff began seeking treatment from Dr. Pena, a family practitioner, for headaches, fatigue, and depression.   In September 1992, blood tests established that plaintiff, an admitted intravenous drug user, had hepatitis. She later started having abdominal pain and diarrhea, for which she also sought treatment, and ultimately stopped

working in December 1992. Plaintiff said that she had been falling asleep at work for days before she left.

 In January 1993, plaintiff was still complaining of fatigue and Dr. Pena referred her to Dr. Burdick, a gastroenterologist, who had a long discussion with her about the potential for treatment with Interferon. [FN2]  Dr. Burdick reported that plaintiff's chronic fatigue was probably secondary to her hepatitis, noting that "fatigue does not differentiate between patients with mild or severe liver disease."  Appellant's App., Vol. II, at 197.

 After plaintiff's longtime boyfriend died of hepatitis in March 1993, she became even more depressed.  Plaintiff moved to California, where she slipped back into using drugs.  She continued to suffer occasional bouts of diarrhea, frequent headaches, fatigue, and peripheral swelling, and sought treatment from Dr. Allen, an internist.  Dr. Allen referred plaintiff to Dr. Olson, a gastroenterologist, who performed a liver biopsy.  The biopsy established that plaintiff had chronic active hepatitis C, [FN3] and Dr. Olson recommended treatment with Interferon.  Because depression can be a side effect of Interferon, Dr. Olson advised that the treatment be delayed three months, to see if plaintiff's depression resolved.  In August 1993, Dr. Allen wrote a letter to the Social Security Administration discussing Dr. Olson's intention of beginning Interferon treatment once plaintiff's depression resolved.  Dr. Allen stated that he believed plaintiff was presently disabled, but that her future course might improve--presumably with Interferon treatment--to the point that she would no longer be disabled.

 **2 In July 1993, plaintiff saw Dr. Kerwin for a second opinion.  Plaintiff complained of fatigue, forgetfulness, blackouts, and swelling.  Dr. Kerwin noted that most of plaintiff's symptoms were related to her hepatitis and depression.  Plaintiff saw Dr. Kerwin numerous times over the next eight months, complaining of fatigue and depression, for which she was prescribed antidepressants and antianxiety medication.  In November 1993, Dr. Kerwin filled out a form for plaintiff's lender on which he stated that plaintiff had been temporarily totally disabled since December 1992, and that her anticipated recovery date was "indefinite."  Id. at 281.

 At the beginning of May 1994, plaintiff moved to Oklahoma so that she could be treated at the Choctaw Nation Hospital.  Plaintiff was first seen there on May 3 and was still being treated there at the time of the hearing before the ALJ in December 1994.  Liver tests performed in May and June 1994 showed an upward trend in certain liver enzymes, and hospital records showed continued complaints of headaches, diarrhea, abdominal pain, decreased energy, depression and anxiety.  Plaintiff was prescribed antidepressants and antianxiety medications, but was advised to avoid Tylenol and other medications that are detoxified by the liver.  At her request, plaintiff also was referred to Dr. Golla, a gastroenterologist.  Although plaintiff testified at the administrative hearing that Dr. Golla was treating her, the record does not contain any of his treatment notes or other medical records.

 On December 14, 1994, Dr. Deese, plaintiff's treating physician at the Choctaw Nation Hospital, opined that plaintiff's hepatitis resulted in a "[s]evere limitation of functional capacity," making her "incapable" of sedentary activity.  Id. at 285.  Dr. Deese also opined that plaintiff's depression resulted in a "[m]oderate limitation" of functional capacity, making her "able to engage in only limited stress situations and engage in only limited interpersonal relations."  Id.  He further stated that plaintiff was "depressed from her chronic disease which has not been treated and is mentally debilitating."  Id. at 286.

 At the administrative hearing in December 1994, plaintiff said that her primary concern since December 1992 had been to get treatment before her liver became so bad that it could not be treated.  She said she had not yet been able to receive Interferon treatment because she could not afford it.  She explained that she could not qualify for Medicaid without a finding of disability, and the Choctaw Nation Hospital told her it did not have the funds to pay for the treatment.  Plaintiff said that her only source of income were the welfare payments she received for her teenage daughter who lived with her.

 Plaintiff testified to very limited daily activities.  She felt that her chronic fatigue was the most limiting of her symptoms.  Plaintiff also testified that she suffered almost daily headaches, which could last as long as four or five hours.  She said she did not take Tylenol or pain relievers because of her liver and was able to obtain relief only by

lying down, sometimes with ice packs on her head.   Plaintiff said she continued to be depressed and was easily upset.  Plaintiff also described difficulties with bouts of diarrhea, stomach pains, and nausea.   She felt that her condition had gotten worse since December 1992.

 **3 At the conclusion of plaintiff's testimony, a vocational expert (VE) was called to testify.   In response to the ALJ's question, the VE testified that if plaintiff's only limitations were that she could lift no more than twenty pounds and frequently lift or carry no more than ten pounds, then she would be able to perform all of the jobs comprising her past relevant work, except those that were performed at the medium exertional level.   If he took into account all the limitations to which plaintiff testified, however, then the VE did not think that plaintiff would be employable.   The VE explained that plaintiff's daily headaches, which she said were relieved only by lying down, would eliminate even sedentary work.   He also identified her fatigue and depression as problematic, saying: "I really feel that the cumulative effects of all these things, her lack of energy as she's demonstrated today even in her manner today, I feel that she just wouldn't have enough energy to sit eight hours a day and do sedentary work."   Id. at 104.

 In February 1995, the Commissioner arranged for plaintiff to be examined by Dr. Inbody, a psychiatrist, who was also given what he described as "a rather extensive medical record" to review.   Id. at 288.   Dr. Inbody diagnosed plaintiff with moderate depression and ongoing polysubstance abuse.   He reported that plaintiff had severe psychosocial stressors and gave her a "global assessment of functioning" (GAF) score of forty-five, id. at 290, which meant that she had "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)," American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994).

 Dr. Inbody's report consisted of a narrative portion and an attached mental RFC form, provided by the Commissioner.   On the latter, Dr. Inbody reported that plaintiff had limited but satisfactory abilities to:  (1) follow work rules;  (2) understand, remember and carry out simple, detailed, and complex job instructions;  and (3) maintain her personal appearance.   He also reported that plaintiff was seriously limited in her abilities to:  (1) relate to co-workers; (2) deal with the public;  (3) use judgment with the public;  (4) interact with supervisors;  (5) deal with work stresses;  (6) function independently;  (7) maintain attention and concentration;  (8) behave in an emotionally stable manner;  (9) relate predictably in social situations;  and (10) demonstrate reliability.   See Appellant's App. Vol. II, at 291-92.

## II. Recent Statutory Amendments

 Before considering plaintiff's challenges to the ALJ's decision, we must first address the Commissioner's argument on appeal that we should affirm the denial of benefits based on recent changes to the Social Security Act. On March 29, 1996, Congress amended provisions of both Title II (disability insurance benefits) and Title XVI (supplemental security income) to provide that "[a]n individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."   Contract With America Advancement Act of 1996, Pub.L. 104-121, § 105(a)(1), (b)(1), 110 Stat. 847, 852, 853 (codified as amended at 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J) (1997)).  The Commissioner contends that these amendments apply to all Title II and Title XVI cases still pending before either the agency or the courts on March 26, 1996, including this one.

 **4 We need not decide whether these amendments apply to the present case because they do not affect our review at this stage of the proceedings.   The implementing regulations make clear that a finding of disability by the Commissioner is a condition precedent to an application of the amendatory language: "If [the Commissioner] find[s] you are disabled and ha[s] medical evidence of your drug addiction or alcoholism, [the Commissioner] must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability."   20 C.F.R. §§ 404.1535(a), 416.935(a).   To make this determination, the Commissioner must decide whether the claimant would still be found disabled if the claimant stopped using drugs.   See id. §§ 404.1535(b)(1), 416.935(b)(1).   If so, then the drug addiction is not a contributing factor material to the finding of disability.   See id. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).   If, however, the claimant's remaining impairments would not be disabling without the drug

addiction, then the drug addiction is a contributing factor material to the finding of disability.   See id. §§ 404.1535(b)(2)(I), 416.935(b)(2)(I).

For us to attempt to apply the amendments, when the Commissioner has made no finding of disability, would be to put the proverbial cart before the horse. Contrary to the Commissioner's suggestion, we may not substitute our judgment for his by deciding whether plaintiff's drug use constitutes an addiction that would be a contributing factor material to a finding of disability were the Commissioner to make such a finding.  Whether plaintiff is disabled and what role her drug use plays in any disability are questions for the Commissioner to address on remand.  For now, we consider only whether the Commissioner correctly determined that plaintiff was not disabled, based on the record as a whole.

### III. Plaintiff's Challenges to The ALJ's Decision

The ALJ found that plaintiff's hepatitis, depression, and substance abuse constituted severe impairments that restricted her to light or sedentary jobs requiring only the ability to understand, remember, and carry out simple instructions. In reaching this conclusion, the ALJ rejected most of plaintiff's allegations about her nonexertional limitations, and also rejected the opinions of plaintiff's treating and examining physicians about her ability to work.

Plaintiff challenges the ALJ's decision on three grounds:  (1) the ALJ did not properly consider medical source opinions;  (2) the ALJ did not properly evaluate the credibility of her subjective complaints;  and (3) the ALJ's determination that she retained the residual functional capacity to perform sustained light and sedentary work was not supported by substantial evidence. Plaintiff's arguments highlight several interrelated errors that undermine the ALJ's entire decision.

**\*\*5** The first error was the ALJ's mischaracterization of the level of plaintiff's daily activities.   This error relates to plaintiff's first and second challenges to the ALJ' decision.   In the spring of 1993, plaintiff filled out three forms containing questions about her daily activities and the effect of her impairments on those activities.  Her mother, Mrs. Camp, also completed a form asking similar questions in September 1993.  According to the ALJ, these forms showed that, despite her impairments, plaintiff still got up in the morning, took a shower and did dishes or laundry.  Further, plaintiff was able to do her own household chores, such as preparing meals and grocery shopping, as well as maintain her hobbies, watch television, read a significant amount, and drive.

In so describing plaintiff's activities, the ALJ ignored other statements on the same forms that evidenced limitations on plaintiff's activities.   For instance, in concluding that plaintiff did a significant amount of reading, the ALJ apparently focused on Mrs. Camp's recitation of the wide variety of materials plaintiff read, while ignoring plaintiff's statement that she fell asleep whenever she watched television or read.

Likewise, the ALJ mentioned only that plaintiff performed some household chores, while ignoring her statements that household chores were the most difficult activity and that she had to stop and start because she tired easily while doing them.  Also, Mrs. Camp said she did not think plaintiff would do well completing household chores if she were under time demands.  She reported that plaintiff tended to get side-tracked because she would start a task, then have to stop due to fatigue or pain, and would forget to complete the task before turning to another one.   Until she moved in with her parents for a brief period in mid-1993, plaintiff reported that she sometimes waited several days to do her dishes.  Even after plaintiff left her parents' home and moved in with her cousin, Mrs. Camp reported that she continued to do plaintiff's laundry for her.

Additionally, while the ALJ was correct in noting that plaintiff said she usually got up, showered, and did "what really stands out to be done," he overlooked the remainder of her statement that she would then lie down on the couch. Id. at 170.   Similarly, while plaintiff did list "decorating & dressing teddy bears in peacock chairs" and silk flower arrangements as hobbies, she reported that she could not work for a long time on a project. Id. at 172.   The ALJ also failed to mention that plaintiff's meal preparation consisted primarily of microwave dinners, sandwiches, and cold

cereal, and that even grocery shopping was tiring for plaintiff.

By mentioning only parts of plaintiff's and her mother's statements, while leaving out other important parts, the ALJ engaged in the kind of selective and misleading evidentiary review that this and other courts have rejected. See, e.g., Sisco v. United States Dep't of Health & Human Servs., 10 F.3d 739, 743 (10th Cir.1993); Teter v. Heckler, 775 F.2d 1104, 1106 (10th Cir.1985); Binion ex rel. Binion v. Chater, 108 F.3d 780, 788 (7th Cir.1997); Fiorello v. Heckler, 725 F.2d 174, 175-76 (2d Cir.1983). The ALJ then used his mischaracterization of the level of plaintiff's daily activities to discount her subjective allegations of disabling nonexertional limitations and to discredit the RFC assessment of Dr. Deese, plaintiff's treating physician at the Choctaw Nation Hospital. The ALJ also used plaintiff's statements from 1993 to discredit her testimony about the level of her activities in December 1994, without considering her testimony that her condition had worsened over time.

**6 In evaluating whether plaintiff's nonexertional limitations were disabling, the ALJ said he followed the familiar framework set forth in Luna v. Bowen, 834 F.2d 161, 163-165 (10th Cir.1987). The Luna analysis proceeds as follows: (1) if the objective medical evidence establishes that the claimant has a physical or mental impairment capable of producing the nonexertional limitation at issue; and (2) accepting all the claimant's allegations as true, there is a loose nexus between the impairment and the nonexertional limitation alleged; then (3) the ALJ must consider all of the evidence--objective and subjective--to determine whether the nonexertional limitation is disabling. Id. at 163.

The ALJ apparently concluded that there was a loose nexus between plaintiff's subjective symptoms and her mental and physical impairments, and the record bears this out. Nonetheless, the ALJ discounted the severity of plaintiff's complaints at the third step of the Luna analysis for the following reasons: (1) "the documentary medical evidence shows the claimant's hepatitis is not of such severity as to be productive of severe, disabling symptomatology," id. at 39-40; (2) although plaintiff complained of diarrhea, vomiting, and abdominal pain, she showed "no significant weight loss," id. at 40; and (3) although plaintiff's hearing testimony "show[ed] restricted daily activities," prior statements by plaintiff and her mother showed less restricted activities, id. The ALJ also stated that plaintiff's "level of functioning appears to be affected primarily by her depression and renewed use of drugs," but then went on to say that "[r]ecords show the claimant's use of drugs is voluntary, and that her depression is 'situational.' " Id.

Turning to the first reason articulated by the ALJ, we note that an ALJ may consider the lack of an objective medical basis to support the degree of limitation alleged as a factor in evaluating a claimant's credibility, but the ALJ may not use the lack of corroborating objective medical evidence to disregard the claimant's allegations. See Luna, 834 F.2d at 165. In any event, the medical evidence concerning the effect of plaintiff's hepatitis on her ability to work generally contradicts the ALJ's conclusion. Dr. Burdick, the first gastroenterologist to whom plaintiff was referred, stated that "fatigue does not differentiate between patients with mild or severe liver disease." Id. at 197. Further, those of plaintiff's physicians who expressed an opinion consistently concluded that plaintiff's hepatitis severely impacted her ability to work. Thus, the medical evidence concerning the severity of plaintiff's hepatitis does not provide a basis for rejecting plaintiff's complaints of chronic fatigue and other hepatitis-related symptoms.

**7 Although the second reason articulated by the ALJ may provide a basis for discounting the severity of plaintiff's abdominal pain, diarrhea, and nausea, it does not undermine her complaints of other nonexertional limitations, such as frequent headaches or fatigue, which plaintiff described as her most limiting symptom. The ALJ's third reason for discounting plaintiff's subjective complaints is based on his mischaracterization of her level of daily activities, which we previously discuss and reject.

The ALJ's conclusion that plaintiff's renewed drug use is one of the primary factors affecting her ability to function is not supported by the record. In fact, except for plaintiff's hearing testimony, the record is essentially devoid of evidence about the effects of plaintiff's drug use. The only evidence directly addressing the effects of plaintiff's drug use is her testimony that she started using heroin again when she moved to California because it helped her escape her feelings and made it easier to cope with her physical symptoms, that smoking marijuana made her headaches better, and that using crank, which she had done five or six times since moving to Oklahoma, ultimately made her feel worse.

This testimony does not provide substantial evidence in support of the ALJ's conclusion about the effects of plaintiff's drug use on her ability to function.

Nor is there record support for the ALJ's suggestion that the effects of plaintiff's depression could be discounted because her depression was merely "situational."   Dr. Olson, the gastroenterologist who treated plaintiff shortly after her boyfriend died, did state in his notes that plaintiff's "problems with depression ... apparently are situational," id. at 247, and he hoped her depression would resolve sufficiently in three months' time to begin Interferon treatment, id. at 243.   The medical record, however, is filled with treatment notes dating back as far as September 1992 that mention plaintiff's depression and reflect treatment with antidepressants.   Moreover, Dr. Inbody's diagnosis of moderate depression as late as February 1995 belies Dr. Olson's suggestion in June 1993 that plaintiff's depression was merely "situational."

The ALJ also erred by selectively crediting and rejecting portions of Dr. Inbody's report.   The ALJ essentially credited all Dr. Inbody's findings and conclusions in the narrative portion of the report about plaintiff's mental status, but then rejected all his conclusions on the attached form about how plaintiff's mental status affected her ability to work.   The ALJ explained that he did not find plaintiff's hearing testimony credible and, therefore, "[i]n view of Dr. Inbody's reliance on the claimant's complaints, the Administrative Law Judge gives little evidentiary weight to the medical opinion of Dr. Inbody."  Id. at 38-39.   The ALJ also stated that Dr. Inbody's opinions were inconsistent with his objective findings.

**8 A physician's medical opinion includes not only his clinical findings and test interpretations, but also his subjective judgments.  Cf. Lester v. Chater, 81 F.3d 821, 832 (9th Cir.1995).  Generally, an ALJ may not rely on some portions of a physician's medical report, while disregarding others.  See Switzer v. Heckler, 742 F.2d 382, 385-86 (7th Cir.1984) ("[T]he Secretary's attempt to use only the portions [of a doctor's report] favorable to her position, while ignoring other parts, is improper.").   Moreover, the reasons the ALJ recited for rejecting a portion of Dr. Inbody's opinion cannot withstand scrutiny.  First, contrary to the ALJ's assumption, it is not clear that the opinions Dr. Inbody expressed about plaintiff's ability to work were based on her subjective complaints, rather than on Dr. Inbody's own medical judgment based on his examination.  In any event, as we discuss above, the ALJ's analysis of plaintiff's subjective complaints was severely flawed and, therefore, cannot provide a proper basis for discrediting Dr. Inbody's opinions.  Further, while a conflict between Dr. Inbody's findings and his conclusions might justify rejecting the latter, the ALJ did not explain how Dr. Inbody's conclusions were inconsistent with his findings.  The only conflict that we see is between Dr. Inbody's statement in the narrative portion of his report that plaintiff "showed no disturbances in attention and concentration," Appellant's App., Vol. II, at 289, and his indication on the attached form concerning work-related abilities that plaintiff's ability to "[m]aintain attention/concentration" was "seriously limited, but not precluded," id. at 291.   Otherwise, Dr. Inbody's statements in the narrative portion of his report do not appear to conflict with his opinions on the form about plaintiff's ability to work.

The ALJ also erred in rejecting the RFC assessment of Dr. Deese on the grounds that it was not supported by either Dr. Inbody's mental status findings, the clinical findings, or the level of plaintiff's daily activities.   Again, the ALJ did not explain what conflict existed between Dr. Inbody's mental status findings and Dr. Deese's conclusions, and we see no conflict between the two. Dr. Deese's conclusion that plaintiff's depression imposed moderate limitations on her ability to work, enabling her "to engage in only limited stress situations and [to] engage in only limited interpersonal relations," id. at 285, was entirely consistent with Dr. Inbody's conclusions about plaintiff's abilities to handle stress and to relate to other people.

The second reason the ALJ gave for rejecting Dr. Deese's opinion appears to relate to his assessment of how plaintiff's hepatitis, rather than her depression, affected her ability to work.   The ALJ simply stated that the clinical findings did not support Dr. Deese's opinion, without providing any further explanation.   Our review of the record shows that the medical evidence consistently established the existence of plaintiff's chronic fatigue, as well as other symptoms related to her hepatitis.   We see no objective medical evidence suggesting that the severity of plaintiff's hepatitis was not sufficient to produce symptoms as severe as those of which plaintiff consistently complained.

**\*\*9** We turn, then, to the final reason the ALJ gave for rejecting Dr. Deese's opinion: that it was not supported by the level of plaintiff's daily activities. The ALJ's distorted assessment of plaintiff's daily activities was not supported by the record, however, so it could not provide a proper basis for discounting Dr. Deese's opinion.

 Having discussed the ALJ's errors in considering medical source opinions and assessing plaintiff's subjective allegations of nonexertional limitations, we turn to plaintiff's final challenge to the ALJ's decision. Plaintiff contends that the evidence does not support the ALJ's conclusion that she retains the RFC for sustained work at the light or sedentary exertional levels. "In order to engage in gainful activity, a person must be capable of performing on a reasonably regular basis." Byron v. Heckler, 742 F.2d 1232, 1235 (10th Cir.1984); see also Washington, 37 F.3d at 1442.

 The record is replete with evidence that plaintiff suffers from chronic fatigue. Plaintiff stated that before she stopped working, she had been falling asleep at work and that her boss had caught her asleep at a machine. Plaintiff also said that she had to stop and start household chores and that she would have to go out to the car and lie down after shopping for thirty minutes. She testified that it took her three months to complete twenty-seven days of community service she was ordered to perform in early 1994, because she was never physically able to work past noon. Even the VE commented that he did not think plaintiff would have the stamina to do even sedentary work for eight hours a day, based upon his observation of her at the hearing. Despite this evidence, the ALJ's assessment of plaintiff's RFC does not take into account the effects of her chronic fatigue. The ALJ either ignored or discredited, without a valid explanation, the evidence supporting plaintiff's contention that she cannot work on a sustained basis.

## IV. Conclusion

 In light of the numerous errors made by the ALJ, we cannot say that the Commissioner's decision denying social security benefits is supported by substantial evidence or adheres to applicable legal standards. Therefore, we must reverse the denial of benefits and remand for further proceedings. If, on remand, the Commissioner finds plaintiff disabled, then he must consider whether she has a drug addiction that is a contributing factor material to the determination of disability and otherwise comply with the 1996 congressional amendments to Titles II and XVI.

 The judgment is REVERSED, and the case is REMANDED to the district court with directions to remand to the Commissioner for further proceedings.

FN* Pursuant to Fed. R.App. P. 43(c), Kenneth S. Apfel is substituted for John J. Callahan, former Acting Commissioner of Social Security, as the defendant in this action.

FN** This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

FN1. After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R.App. P. 34(f); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

FN2. Interferon is an antiviral agent used in the treatment of certain kinds of hepatitis. It is "given by ... injection, is expensive, and produces bothersome flu-like side effects in almost all patients." The Merck Manual of Diagnosis & Therapy 906 (Robert Berkow & Andrew J. Fletcher eds., 16th ed.1992).

FN3. Chronic active hepatitis, sometimes called chronic aggressive hepatitis is a "serious disorder [which] often results in liver failure and/or cirrhosis.... Nonspecific malaise, anorexia, and fatigue often dominate the clinical picture, sometimes with low-grade fever and nondescript upper abdominal discomfort. Jaundice is variable and is not always present." The Merck Manual of Diagnosis & Therapy, at 905. "Prognosis is highly variable.... Cases associated with [hepatitis B virus] or [hepatitis C virus] tend to progress and ... are usually resistant to therapy." Id. at 906.

END OF DOCUMENT